UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

St. Paul Mercury Insurance Company,

Plaintiff,

v. Civ. No. 01-297 (JNE/JGL)

JBA International, Inc.,

Defendant.

ORDER

JBA International, Inc.,

Plaintiff,

v. Civ. No. 01-2161 (JNE/JGL)

St. Paul Mercury Insurance Company,

Defendant.

---

Patricia St. Peter, Esq., and Eric E. Caugh, Esq., Zelle, Hoffman, Voelbel, Mason & Gette LLP, appeared for St. Paul Mercury Insurance Company.

Richard D. Snyder, Esq., and Emily E. Duke, Esq., Fredrikson & Byron, P.A., appeared for JBA International, Inc.

---

This action involves a dispute between an insured, JBA International, Inc. (JBA), and an insurer, St. Paul Mercury Insurance Company (St. Paul), about the scope and amount of insurance coverage available to JBA. St. Paul brought an action against JBA for declaratory relief. JBA asserts several causes of action against St. Paul, including breach of contract, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, and violation of the New Jersey Consumer Fraud Act (NJCFA), N.J.S.A. § 56:8-2. JBA also seeks declaratory relief with respect to St. Paul's duties to defend, to indemnify, and to settle. St. Paul now moves for partial summary judgment. St. Paul asserts that it is entitled to summary judgment with respect to

FILED SEP 30 2003
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED
DEPUTY CLERK'S INITIALS

JBA's claims for consumer fraud, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. St. Paul seeks partial summary judgment on JBA's claims for declaratory relief and breach of contract. For the reasons set forth below, the Court denies the motions pertaining to JBA's claims for declaratory relief and breach of contract, grants the motion regarding JBA's NJCFA claim, and grants in part the motion relating to JBA's claims for breach of fiduciary duty, and breach of the covenant of good faith and fair dealing.

## I. BACKGROUND

JBA is a computer software company that sells enterprise resource planning (ERP) software and services. St. Paul issued a "claims made" Technology Errors and Omissions Liability Protection policy (Policy) to JBA. The Policy was first effective from June 30, 1997, to June 30, 1998. After renewing the Policy twice, JBA cancelled it on September 21, 1999. When it cancelled the Policy, JBA added an extended reporting period.

Three lawsuits filed against JBA form the basis of some of the motions before the Court. The first lawsuit arose out of a Software Licensing Agreement entered into by JBA and American Airlines, Inc. in June 1995. In December 1997, The SABRE Group, Inc. (SABRE), as successor in interest to American Airlines, filed a lawsuit against JBA asserting various causes of action arising out of JBA's alleged failure to satisfy its obligations under the Software Licensing Agreement. JBA first notified St. Paul of the lawsuit in June 1999. St. Paul concluded that SABRE had first made its claim before June 30, 1997, and denied coverage.

The second lawsuit arose out of a contract executed by Hartmarx Corporation and JBA in February 1997. The contract called for JBA to provide software and consulting services to Hartmarx. In June 1999, Hartmarx filed a lawsuit against JBA asserting several causes of action arising out of JBA's alleged failure to satisfy its contractual obligations. In August 1999, St.

Paul agreed to provide a defense to JBA subject to a complete reservation of rights. St. Paul initially assigned the claim to the June 1998-June 1999 policy period: "[U]ntil our investigation in this issue has been completed, we consider this claim to have been made during the 6/30/98 through 6/30/99 policy period." Upon further investigation, St. Paul determined that Hartmarx first made its claim during the June 1997-June 1998 policy period.

The third lawsuit arose out of a contract entered into by JBA and Woodcraft Industries, Inc. (Woodcraft) in March 1999. JBA agreed to provide Woodcraft with ERP software and consulting services. During the extended reporting period, Woodcraft filed an action against JBA alleging several causes of action including breach of contract, breach of warranty, fraudulent misrepresentation, and negligent misrepresentation. St. Paul declined to participate in JBA's settlement of the lawsuit.

## II. DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, Rule 56(e) requires the party opposing the motion to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must

look at the record and any inferences to be drawn from it in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A. Coverage for claims by Hartmarx and SABRE**

Under New Jersey[1] law, the interpretation of an insurance contract is a question of law. *Nat'l Union Fire Ins. Co. v. Transp. Ins. Co.*, 765 A.2d 240, 243 (N.J. Super. Ct. App. Div. 2001). Clear and unambiguous policy language must be given its plain and ordinary meaning. *Rosario ex rel. Rosario v. Haywood*, 799 A.2d 32, 38 (N.J. Super. Ct. App. Div. 2002). If an ambiguity exists in policy language, the language should be interpreted to comport with the reasonable expectations of the insured. *Id.* Ambiguity exists if policy language is "so confusing that the average policyholder cannot make out the boundaries of coverage." *Lee v. Gen. Accident Ins. Co.*, 767 A.2d 985, 987 (N.J. Super. Ct. App. Div. 2001). "In exceptional circumstances, 'even an unambiguous contract has been interpreted contrary to its plain meaning so as to fulfill the reasonable expectations of the insured.'" *Gibson v. Callaghan*, 730 A.2d 1278, 1283 (N.J. 1999).

St. Paul asserts that it is entitled to summary judgment on JBA's causes of action for declaratory relief and breach of contract insofar as the causes of action are based on claims made against JBA by Hartmarx and SABRE. Resolution of St. Paul's argument turns on the interpretation of several provisions in the Policy. The Policy applies to "claims or suits for covered loss only when they're first made or brought while this agreement is in effect." A

---

1 The action by JBA against St. Paul was transferred to the District of Minnesota from the District of New Jersey. The parties' arguments regarding the Policy's interpretation are cast primarily in terms of New Jersey law, though St. Paul asserts that it may yet argue that Minnesota law governs the Policy's interpretation. A comprehensive choice-of-law analysis has not been presented to the Court. For present purposes, the Court assumes that New Jersey law applies.

"claim" is a "demand which seeks damages," and a "suit" is a "civil proceeding which seeks damages." The Policy defines when a claim or suit is first made or brought:

> We'll consider a claim or suit for covered loss to be first made or brought on the earliest of the following dates:
>
> •The date that we or any protected person receive a written claim or a written notice of suit.
>
> •The date that we receive a notice of an error from any protected person. However we won't accept such a notice unless it also describes what loss may result from the error.
>
> •The date that any protected person could reasonably foresee that a claim or suit would be made or brought.
>
> We consider it reasonable that a protected person could foresee a claim or suit being made or brought if one of your customers has done any of the following:
>
> •Repeatedly complained to the protected person about one or more problems with your computer or electronic products or services.
>
> •Sent their attorney a copy of one or more of the written complaints that they had sent to the protected person.
>
> •Refused to pay all or part of your charges for those products or services.
>
> •Advised the protected person that those products or services have failed to perform in compliance with your promises.
>
> •Demanded a refund of part or all of their payment for those products or services.
>
> •Threatened to take legal action against you.

JBA contends that a claim or suit must be assigned to the policy period in effect when the suit is filed or when the claim is made. Because SABRE filed its lawsuit during the June 1997-June 1998 policy period, JBA argues, St. Paul improperly denied coverage. Similarly, because Hartmarx filed suit during the June 1998-June 1999 policy period, JBA maintains that St. Paul

improperly assigned Hartmarx' lawsuit to the June 1997-June 1998 policy period. JBA raises several arguments in support of its interpretation of the Policy.

*1. Claim or suit*

JBA first argues that assignment of a claim or suit to a policy period before the claim or suit is actually made is inconsistent with the Policy's definition of claim or suit. Without a claim or suit, JBA asserts that St. Paul has no coverage obligation. Consequently, JBA maintains that a claim or suit must be assigned to the policy period in effect when the claim or suit is made. The Court disagrees. JBA conflates the event that may trigger St. Paul's coverage obligation—a claim or suit—with the determination of which policy period applies to the claim or suit once made. The Policy applies to "claims or suits for covered loss only when they're first made or brought while this agreement is in effect." The Policy's definition of when a claim or suit is "first made or brought" includes the date when "any protected person could reasonably foresee that a claim or suit would be made or brought." Thus, assignment of a claim to a policy period does not necessarily depend on when the claim or suit is made. A reasonably foreseeable claim or suit may be assigned to a policy period before the claim or suit is actually made. The Policy unambiguously allows for the assignment of a claim or suit to a policy period before the claim or suit is actually made.

*2. Regulatory estoppel*

Relying on the "regulatory estoppel" doctrine, JBA argues that St. Paul is estopped from assigning a claim or suit to a policy period before the claim or suit is made based on representations that St. Paul made to insurance regulators in 1994. *See Morton Int'l, Inc. v. Gen. Accident Ins. Co.*, 629 A.2d 831, 847-48 (N.J. 1993). In *Morton*, the New Jersey Supreme Court interpreted "sudden and accidental" exceptions to a pollution exclusion clause. *Id.* at 847.

Although it agreed with the insurer's interpretation of the exclusion's plain meaning, the New Jersey Supreme Court declined to enforce the exclusion as written. *Id.* at 847-48. Literal enforcement of the clause would have rendered the insurers' presentation of the clause to insurance regulators "grossly misleading," *id.* at 847, and would have rewarded the insurance industry for its misrepresentation, *id.* at 848. Here, the record does not support JBA's contention that St. Paul misrepresented the effect of changes to its 1986 policy to insurance regulators in 1994. With respect to the provisions governing when the Policy applies, St. Paul represented that "[n]o coverage difference is intended" by changes to language contained in the 1986 version. Given the essentially identical language regarding when the policies apply, St. Paul's representation to insurance regulators in 1994 cannot reasonably be interpreted as misleading. Accordingly, the Court declines to apply the regulatory estoppel doctrine.

*3. Estoppel*

Under New Jersey law, an insurer's misrepresentations regarding coverage may estop it from later denying coverage:

> [W]here an insurer or its agent misrepresents, even though innocently, the coverage of an insurance contract, or the exclusions therefrom, to an insured before or at the inception of the contract, and the insured reasonably relies thereupon to his ultimate detriment, the insurer is estopped to deny coverage after a loss on a risk or from a peril actually not covered by the terms of the policy.

*Harr v. Allstate Ins. Co.*, 255 A.2d 208, 219 (N.J. 1969). JBA maintains that St. Paul is estopped from assigning Hartmarx' suit to the June 1997-June 1998 policy period based on statements that St. Paul made to JBA. JBA relies on a letter written by the Director of St. Paul's Technology Claim group to JBA's broker in response to an evaluation of the Policy prepared by JBA's counsel. JBA's written observations of the Policy include:

> [W]hen is a claim made under the policy? The first concept here is that "claims" are "made" against an insured by the upset third party. The concept of

> claims being "made" does not relate to claims being "made" by JBA against its insurer. The policy goes on at some length—see pages 3 and 4—to define an early date when a claim is "made" against JBA. In essence, any circumstances showing the existence of an "unhappy" customer would likely result in an argument by the insurer that a "claim" was "made."

St. Paul's response provides in relevant part:

> As you know, claims made policies all attempt to define when a claim is made and when the insured first knew of the claim, or should have known of a potential claim. St. Paul attempts to provide a more specific description th[a]n other carriers may provide, but silence on this point by other carriers should not be interpreted as broader coverage.
>
> We take exception to the statement that the existence of an unhappy customer would likely result in an argument that a claim has been made. However, I am sure you will agree that it is always prudent to place your current carrier on notice of potential claims, this would be especially true when an insured is about to change insurance carriers. If, for example, the insured has a dissatisfied customer that has refused to pay for a product or service or has demanded a refund of amounts paid, we respectfully suggest that this is a potential claim that should be reported.

JBA's estoppel argument is premised on the sentence regarding the existence of an unhappy customer. According to JBA, the sentence represents that "a 'claim' is not considered to be made when an unhappy customer complains." JBA contends that it reasonably relied on the representation in its decision to renew the policy. Consequently, the argument proceeds, St. Paul is estopped from assigning a claim or suit to a policy period before the claim or suit is actually made based on an unhappy customer's complaints or failure to pay.

JBA's argument ignores the context in which the sentence appears. The letter itself directs JBA to the list of events that render a claim reasonably foreseeable, gives two examples from the list, and characterizes them as "potential claim[s]." Under these circumstances, the letter cannot reasonably be interpreted to mean anything other than that St. Paul would enforce the Policy as written. Even assuming that the letter misrepresents the coverage provided by the policy, the record does not support JBA's assertion that it reasonably relied on the letter in its

decision to renew the Policy. It is undisputed that JBA renewed the Policy after receiving the letter. It is also undisputed that Jane Marshaleck, who was JBA's chief financial officer and was responsible for obtaining JBA's insurance coverage, knew of the Policy's definition of when a claim or suit is first made when JBA renewed the Policy and thought that the definition was not reasonable. For these reasons, the Court concludes that JBA is not entitled to estop St. Paul from enforcing the policy as written.

*4. Reasonable expectations*

To satisfy its reasonable expectations, JBA asserts that the Policy should be interpreted so as to compel St. Paul to assign a claim or suit to the policy period when it is made or brought. In *Sparks v. St. Paul Insurance Co.*, 495 A.2d 406 (1985), the New Jersey Supreme Court explained the rationale underlying the reasonable expectations doctrine:

> The interpretation of insurance contracts to accord with the reasonable expectations of the insured, regardless of the existence of any ambiguity in the policy, constitutes judicial recognition of the unique nature of contracts of insurance. By traditional standards of contract law, the consent of both parties, based on an informed understanding of the terms and conditions of the contract, is rarely present in insurance contracts. Because understanding is lacking, the consent necessary to sustain traditional contracts cannot be presumed to exist in most contracts of insurance. Such consent can be inferred only to the extent that the policy language conforms to public expectations and commercially reasonable standards. In instances in which the insurance contract is inconsistent with public expectations and commercially accepted standards, judicial regulation of insurance contracts is essential in order to prevent overreaching and injustice.

*Id.* at 414 (citations omitted). *Sparks* considered a professional liability "claims made" policy. *Id.* at 407. The policy provided no retroactive coverage in its first year—that is, it provided coverage only to errors that occurred during the policy year and that were reported to the insurer within the policy year. *Id.* at 408. Renewal of the policy created retroactive coverage to the date of the first policy's effective date. *Id.* The New Jersey Supreme Court acknowledged the severe restrictions placed on retroactive coverage:

> St. Paul's policy combines the worst features of "occurrence" and "claims made" policies and the best of neither. It provides neither the prospective coverage typical of an "occurrence" policy, nor the "retroactive" coverage typical of a "claims made" policy. During the first year that the policy was in force, it provided no retroactive coverage for occurrences prior to the effective date of the policy. Thus, it afforded the insured only minimal protection against professional liability claims. Only claims asserted during the policy year, based on negligence that occurred during the policy year, and that were subsequently communicated to the company during the policy year were under the umbrella of coverage.
>
> The realities of professional malpractice, however, suggest that it would be the rare instance in which an error occurred and was discovered with sufficient time to report it to the insurance company, all within a twelve-month period. The victims of professional malpractice are frequently unaware of any negligence until their injury becomes manifest long after the error or omission was committed.

*Id.* at 414-15. Ultimately, *Sparks* held that the absence of retroactive coverage in a "claims made" policy does not comport with the reasonable expectations of policyholders:

> We hold, however, that where there has been no proof of factual circumstances that would render such limited retroactive coverage both reasonable and expected, a "claims made" policy that affords no retroactive coverage whatsoever during its initial year of issuance does not accord with the objectively reasonable expectations of the purchasers of professional liability insurance. The fact that subsequent renewals of that policy provide minimal retroactive coverage, *i.e.*, to the effective date of the original policy, does not cure the significant deficiency in the underlying policy.
>
> To enforce policies that provide such unrealistically narrow coverage to professionals, and, derivatively, to the public they serve, would in our view cause the kind of broad injury to the public at large contemplated by the doctrine that precludes the enforcement of contracts that violate public policy.

*Id.* at 415 (footnote omitted).

Here, St. Paul first argues that JBA cannot rely on the reasonable expectations doctrine because a broker procured the policy for JBA. St. Paul relies on *Werner Industries, Inc. v. First State Insurance Co.*, 548 A.2d 188 (N.J. 1988). In that case, unambiguous language of an insurance policy was enforced to the detriment of the insured, a sophisticated party that had procured the insurance through a broker. *Id.* at 192. Because the policy provided neither

unrealistic nor inadequate coverage, and because there was no showing that the coverage did not meet the insured's expectations, the plain language of the policy had to be enforced unless the insurer had created a different understanding in the insured. *Id.* For present purposes, the relevant point from *Werner* is that the presence of an insurance broker did not preclude the insured from showing that the terms of the policy were neither bargained for nor understood. *Id.* at 192-93. Indeed, "only where it is clear that an insurance policy was 'actually negotiated or jointly drafted,' and where the policyholder had bargaining power and sophistication, is the rule of strict construction of policy terms against the insurer not invoked." *Diamond Shamrock Chems. Co. v. Aetna Cas. & Sur. Co.*, 609 A.2d 440, 460 (N.J. Super. Ct. App. Div. 1992). The Court therefore rejects St. Paul's contention that JBA's procurement of the Policy through a broker necessarily precludes JBA from relying on the reasonable expectations doctrine.

Turning to whether the reasonable expectations doctrine precludes enforcement of the Policy as written, St. Paul asserts that the rationale underlying the holding of *Sparks* is absent because the Policy provides retroactive coverage. The Policy's provisions regarding what it applies to state:

> We'll pay amounts any protected person is legally required to pay as damages for covered loss that:
>
> •results from your computer or electronic products or services; and
>
> •is caused by an error committed on or after the retroactive date and before the ending date of this agreement.

The Policy's retroactive date is October 31, 1994, more than two years before the first policy's effective date of June 30, 1997. Thus, the Policy appears to provide retroactive coverage. The provision of retroactive coverage is, however, restricted by the Policy's definition of when a claim is first made. As already noted, the Policy unambiguously allows for the assignment of a

claim or suit to a policy period before the claim or suit is actually made. If a claim or suit was reasonably foreseeable before June 30, 1997, the Policy would not cover it. Given the nature of JBA's work—lengthy installation of complex software—it appears that the Policy's definition of when a claim is first made effectively eliminates retroactive coverage.[2] Whether such effectively limited retroactive coverage was both reasonable and expected when JBA purchased the Policy, and how the Policy should be interpreted if it cannot be enforced as written are issues outside the scope of the arguments presented to the Court. The Court declines to speculate as to these issues. Accordingly, the Court denies the motion regarding St. Paul's coverage obligations with respect to the claims by Hartmarx and SABRE against JBA.

**B. New Jersey Consumer Fraud Act**

St. Paul asserts that it is entitled to summary judgment on JBA's claim under the NJCFA. The NJCFA provides in relevant part:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

N.J.S.A. § 56:8-2. JBA asserts that St. Paul violated the NJCFA in connection with JBA's decision to purchase the Policy from St. Paul in 1997 and to renew it in 1998.

---

[2] At the motion hearing, St. Paul acknowledged that customer complaints are common in the ERP industry: "[T]his industry is filled with problems, filled with complaints. Anybody who has gone through a system installation, you are going to have bugs and problems and complaints."

*1. Purchase of the Policy*

St. Paul first argues that it did not make any misrepresentations in connection with JBA's decision to purchase the Policy. According to JBA, St. Paul made misrepresentations in a letter from St. Paul to JBA's broker comparing the Policy with JBA's policy at that time. The letter states in relevant part: "As I explained, our form is much broader and specifically tailored to the needs of this type [of] insured." At her deposition, the letter's author could not identify any basis for the statement that St. Paul provided broader coverage that was specifically tailored to an insured such as JBA. Viewed in the light most favorable to JBA, a reasonable finder of fact could conclude that St. Paul made a misrepresentation regarding the Policy.

St. Paul next argues that it is entitled to summary judgment because JBA did not receive the letter that St. Paul sent to JBA's broker. St. Paul's argument essentially imports the element of reliance into the NJCFA, but a plaintiff asserting a cause of action under the NJCFA does not have to establish reliance. *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997); *see Perth Amboy Iron Works, Inc. v. Am. Home. Assurance Co.*, 543 A.2d 1020, 1026 (N.J. Super. Ct. App. Div. 1988) (interpreting the NJCFA "to encompass the acts of remote suppliers, including suppliers of component parts, whose products are passed on to a buyer and whose representations are made to or intended to be conveyed to the buyer"), *aff'd*, 571 A.2d 294 (N.J. 1990). Instead, the plaintiff need only establish a causal nexus. *See Varacallo v. Mass. Mut. Life Ins. Co.*, 752 A.2d 807, 813-14 (N.J. Super. Ct. App. Div. 2000). According to JBA's broker, he relied on St. Paul's comparison in recommending the Policy to JBA. Marshaleck testified that she relied on the broker's expertise in deciding to purchase the Policy. Viewed in the light most favorable to JBA, the record reveals a causal nexus between the alleged misrepresentation and JBA's purchase of the Policy.

Finally, St. Paul asserts that it is entitled to summary judgment because JBA has not incurred any ascertainable loss. The NJCFA allows a private plaintiff to recover "any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented." N.J.S.A. § 56:8-19. Here, JBA contends that it incurred an ascertainable loss because of a contract-price exclusion in the policy, and St. Paul's denial of coverage for the SABRE lawsuit. JBA's argument fails to address how these items constitute ascertainable losses resulting from St. Paul's alleged misrepresentations. The June 1997-June 1998 policy has a $2 million limit. The record does not contain any evidence suggesting that St. Paul misled JBA about the policy limit. St. Paul has paid the entire $2 million limit.[3] Viewing the record in the light most favorable to JBA, the Court concludes that JBA has not incurred an ascertainable loss as a result of St. Paul's alleged violation of the NJCFA. Accordingly, the Court concludes that St. Paul is entitled to summary judgment on JBA's NJCFA claim as it relates to its decision to purchase the policy in 1997. *See Weinberg v. Sprint Corp.*, 801 A.2d 281, 293 (N.J. 2002).

*2. Renewal of the Policy*

JBA contends that St. Paul made misrepresentations about the Policy in connection with JBA's decision to renew it in June 1998. JBA relies on a sentence in the letter sent from St. Paul to JBA's insurance broker regarding when a claim is first made. As already discussed in the analysis of JBA's estoppel argument, the letter does not misrepresent the coverage provided by

---

[3] If JBA prevails on the argument that the Policy does not comport with its reasonable expectations and the Policy cannot be enforced as written, the limits applicable to the June 1997-June 1998 policy period may not be exhausted. In that case, JBA nevertheless would not have incurred an ascertainable loss because JBA would be entitled to make claims against the remaining coverage.

St. Paul. Accordingly, the Court concludes that St. Paul is entitled to summary judgment on JBA's NJCFA claim as it relates to JBA's decision to renew the Policy.

**C. Bad faith claims**

JBA's "bad faith" claims consist of causes of action for breach of the covenant of good faith and fair dealing, and breach of fiduciary duty. The claims arise out of St. Paul's handling of the claims asserted against JBA by Hartmarx and Woodcraft.

*1. Hartmarx*

JBA asserts that St. Paul acted in bad faith in connection with two opportunities to settle Hartmarx' claim. The first took place in December 1999, and the second occurred in 2001. According to St. Paul, the Court should evaluate St. Paul's coverage decisions under a "fairly debatable" standard. *See Pickett v. Lloyd's*, 621 A.2d 445, 447 (N.J. 1993). *Pickett* recognized a cause of action for an insurer's bad faith failure to pay an insured's claim. *Id.* An insurer's denial of benefits gives rise to a cause of action if the reasons for the denial "are not even debatably valid and the economic losses sustained by the policyholder are clearly within the contemplation of the insurance company." *Pickett*, 621 A.2d at 447. A plaintiff must show the absence of any reasonable basis for denying the policy's benefits and the insurer's knowledge or reckless disregard of the lack of a reasonable basis for denying a claim. *Id.* at 453. *Pickett* acknowledges the existence of a separate cause of action premised on an insurer's bad-faith refusal to settle a third-party claim against an insured within policy limits, when the refusal results in a judgment against the insured that exceeds the policy limits. *Id.* at 449-50 (discussing *Rova Farms v. Investors Ins. Co.*, 323 A.2d 495 (N.J. 1974)). The cases cited by St. Paul to support its argument that the fairly-debatable standard applies also acknowledge the existence of a separate cause of action premised on an insurer's bad-faith refusal to settle a third-party claim

against an insured. *See Frankel v. St. Paul Fire & Marine Ins. Co.*, 759 A.2d 869, 872 (N.J. Super. Ct. App. Div. 2000); *Universal-Rundle Corp. v. Commercial Union Ins. Co.*, 725 A.2d 76, 90 (N.J. Super. Ct. App. Div. 1999). The Court therefore rejects St. Paul's argument that the fairly-debatable standard necessarily applies.

JBA contends that the Court should evaluate its allegations against St. Paul under the standard articulated in *Rova Farms*. That case states:

> [W]here under the policy the insurer reserves the full control of the settlement of claims against the insured, prohibiting him from effecting any compromise except at his own expense, that reservation—viewed in the light of the carrier's obligation to pay on behalf of the insured all sums up to the policy limits which he shall become obligated to pay—imposes upon the insurer the duty to exercise good faith in settling claims. . . .
>
> By virtue of the terms of such a policy, proscribing the insured from settling in his own behalf, the carrier has made itself the agent of the insured in this respect. Thus the relationship of the company to its insured regarding settlement is one of inherent fiduciary obligation. When an opportunity for settlement approximates the limit of coverage, it may be tempting for the insurance company to gamble on the outcome of a trial, its exposure not being considerably affected by a verdict in excess of coverage. Recognizing that such temptations on the part of the carrier are directly in conflict with the interest of the insured in settling within the limits of coverage and thereby avoiding the prospect of excess judgment, this Court declared that where, as in the present case, any adverse verdict at trial is likely to exceed the policy limit, the boundaries of good faith become more compressed in favor of the insured, and the carrier can justly serve its interests and those of its insured only by treating the claim as if it alone might by liable for any verdict which may be recovered.

323 A.2d at 505 (citations omitted). Prescience on the part of the insurer is not required, but a decision not to settle must be thoroughly honest, intelligent, and objective. *Id.* at 503. All factors bearing on the advisability of settlement must be considered. *Id.* These factors include the view of the insurer as to liability, the anticipated range of an adverse verdict, the strength and weakness of the evidence so far as known, the history of similar cases in the area where the

action is to be tried, and the relative appearance, persuasiveness, and appeal of the claimant, the insured, and witnesses at trial. *Id.* at 503-04.

As to the settlement opportunity in late 1999, the Court concludes that *Rova Farms* applies. Less than six months after filing an action against JBA demanding $18 million, Hartmarx expressed an interest in settling. Having agreed to provide a defense to JBA subject to a complete reservation of rights, St. Paul initially did not consent to JBA settling the action. The parties sharply contest the amount of information made available to St. Paul to evaluate Hartmarx' claim, the extent to which St. Paul attempted to investigate the claim, whether JBA and Hartmarx ever reached a settlement in principle, and whether that settlement was ever communicated to St. Paul. On this record, the Court cannot conclude as a matter of law that St. Paul's refusal to settle in late 1999 was thoroughly honest, intelligent, and objective.

JBA contends that the Court should evaluate St. Paul's decision to deny coverage for the Hartmarx action in 2001 under *Rova Farms* as well because that decision coincided with another settlement opportunity. The Court disagrees. In 2001, St. Paul refused to provide coverage, having concluded that Hartmarx first made its claim during the June 1997-June 1998 policy period. Because the limits of that policy period were exhausted, St. Paul declined to provide coverage. As a decision to refuse coverage as opposed to a refusal to settle, the fairly-debatable standard of *Pickett* applies.

With regard to whether its decision to refuse coverage in 2001 was fairly debatable, St. Paul declined coverage based in part on information obtained in 2000 about the work that JBA had performed for Hartmarx. The plain language of the Policy supports St. Paul's assertion that the Hartmarx claim was first made during the June 1997-June 1998 policy period. During that time, Hartmarx repeatedly complained to JBA, repeatedly advised JBA that JBA's products and

services had failed to comply with JBA's promises, representations, and warranties, and Hartmarx refused to pay JBA. Viewed in the light most favorable to JBA, the Court concludes that St. Paul's decision to deny coverage to JBA for the Hartmarx action in 2001 was fairly debatable. Accordingly, St. Paul is entitled to summary judgment on JBA's bad faith claims insofar as they depend on St. Paul's decision in 2001 to deny coverage to JBA for the Hartmarx action.

*2. Woodcraft*

The parties agree that the analysis set forth in *Pickett* applies to JBA's claim that arises out of St. Paul's handling of Woodcraft's claim against JBA. Woodcraft brought suit against JBA during the extended reporting period. After cancelling the Policy, JBA obtained a policy from another insurer. Because the other insurer refused coverage, St. Paul agreed to provide a defense to JBA subject to a reservation of rights. Ultimately, Woodcraft and JBA settled within the deductible of the other insurer's policy. St. Paul declined to participate in the settlement.

Before considering the parties' arguments, the Court sets forth several relevant provisions from the Policy. The Policy provides for an extended reporting period:

> [W]e'll consider any claim or suit first made or brought during the extended reporting period to have been made or brought on the ending date of this agreement.
>
> In addition, the extended reporting period will cause us to apply this agreement as excess insurance. We explain when and how we'll do so in the Other Insurance section.

The Other Insurance section provides in relevant part:

> [I]f the extended reporting period applies, we'll apply this agreement as excess insurance over any part of any other valid and collectible insurance that:
>
> •is available under any policy in effect during the extended reporting period; and

> •provides coverage for claims or suits for covered loss first made or brought during the extended reporting period.
>
> We'll do so whether such other insurance applies on a primary, excess, contingent or any other basis.
>
> We explain how we'll apply this agreement as excess insurance in the Excess insurance section.

The Excess insurance section provides in relevant part:

> When this agreement is excess insurance, we'll have no duty to defend any claim or suit that any other insurer has a duty to defend. However we'll defend a claim or suit for covered loss if the other insurers won't. In return we'll require that the protected persons give us all of their rights against those insurers.
>
> Also, we'll pay only the amount of damages that's in excess of:
>
> •the total amount that all such other insurance would pay if this agreement didn't exist; and
>
> •the total of all deductible and self-insured amounts under all such other insurance.

The Court turns now to the parties' arguments regarding St. Paul's denial of coverage for the Woodcraft claim.

JBA contends that St. Paul had no reasonable basis for determining that the St. Paul policy operated as excess insurance because the deductible of the other insurer's policy is not considered "valid and collectible insurance." JBA relies on the following passage from *American Nurses Association v. Passaic General Hospital*, 484 A.2d 670 (N.J. 1984): "In our opinion, lay persons would consider 'insurance' to refer to another insurance policy comparable to the one issued to them. Such references would not ordinarily be understood to include the obligation of an insured to pay a deductible." *Id.* at 673. JBA's reliance on *American Nurses* is misplaced. Again, the Policy's Excess insurance provisions provide that St. Paul will pay damages that exceed the amount of the deductible contained in other insurance. The plain

language of the Policy supports St. Paul's denial of coverage to JBA for the Woodcraft claim. Viewing the record in the light most favorable to JBA, the Court concludes that St. Paul had a reasonable basis to deny coverage to JBA for the Woodcraft claim, and that St. Paul is entitled to summary judgment on this claim.

## III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. St. Paul's Motion for Partial Summary Judgment Declaring No Coverage Exists for the *SABRE* Claim [Docket No. 70 in Civ. No. 01-297; Docket No. 81 in Civ. No. 01-2161] is DENIED.

2. St. Paul's Motion for Partial Summary Judgment Declaring that St. Paul has Fulfilled its Obligation to JBA for the *Hartmarx* Claim [Docket No. 67 in Civ. No. 01-297; Docket No. 84 in Civ. No. 01-2161] is DENIED.

3. St. Paul's Motion for Partial Summary Judgment on JBA's Alleged Bad Faith Claims [Docket No. 61 in Civ. No. 01-297; Docket No. 78 in Civ. No. 01-2161] is GRANTED IN PART and DENIED IN PART.

4. Count VIII of JBA's Third Amended Complaint [Docket No. 32 in Civ. No. 01-2161] is DISMISSED.

5. St. Paul's Motion for Partial Summary Judgment on JBA's New Jersey Consumer Fraud Act Claim [Docket No. 64 in Civ. No. 01-297; Docket No. 75 in Civ. No. 01-2161] is GRANTED.

6. Count IX of JBA's Third Amended Complaint [Docket No. 32 in Civ. No. 01-2161] is DISMISSED.

Dated: September 30, 2003

JOAN N. ERICKSEN
United States District Judge